The plaintiff was a brakeman on the defendant's railroad. The road is a short one, extending from Port Henry to Mineville, a distance of about seven miles. Because of the steep grade it is not built in a straight course, but runs up the mountain through a series of "Y's," which mitigate the ascent. The train in question when made up at Port Henry consisted of a passenger car, which was placed in the front, then the tender of the engine, then the engine itself, then a number of gondolas, and finally about twenty ore "jimmies." The latter are small cars, shaped as a hopper, with a running board six or eight inches wide on each side. The brakemen stand on the running board to work the brakes. On the day of the accident the plaintiff was stationed on the last jimmy. When the train reached the first Y it had to be divided and made up again with the cars in a new order. The passenger car was pushed into the stem of the Y and was left standing there. The engine then attached itself to the gondolas and pushed them into one of the branches of the Y for a distance of about four hundred feet. It then went back, picked up the jimmies and proceeded to push them so as to connect with the gondolas. The plaintiff stood on the jimmy farthest from the engine. His duty was to couple the jimmies and the gondolas when they came together. To prepare for this he was taking out a link which had broken and was putting in a new one. The conductor had instructed him to make this substitution at the Y. While he was bending down in this work, a violent jar threw him to the ground, and he suffered injuries for which he sues. He fell because the engineer had suddenly and without warning stopped the engine. Through some blunder the engine which *Page 63 
was pushing the jimmy forward had automatically coupled itself to the passenger car, so that it had the jimmies in front of it and the passenger car behind it. To make up the train properly the passenger car should have been left where it stood until the jimmies and the gondolas had been coupled, and the engine, rejoining the car, should then have taken it through a switch to a position in front of the gondolas at the head of the train. The engineer on discovering this mistake applied the air brakes, after he had pushed the jimmies about fifty or sixty feet, and while they were still about three hundred feet from the gondolas, where a stop was to be expected. He gave no signal that a stop was coming. At that point the grade was downward for a short distance, and, with the sudden stoppage of the engine, the jimmies ran forward to the extent of the slack between them. The jolt increased in intensity as it was communicated from car to car, and the greatest shock was felt at the car farthest from the engine, on which the plaintiff was standing. It was so violent that a companion on the same car, who was standing up and was thus better able to save himself, escaped injury only by jumping to the ground.
We think that the evidence would have justified the jury in finding that the defendant's engineer was negligent in failing to warn the plaintiff that the engine was about to stop; and under section 64 of the Railroad Law (L. 1910, ch. 481) the negligence of the engineer is that of a vice principal and is chargeable to the defendant. The dismissal of the complaint was, therefore, error. We do not mean to hold that a railroad company is always under a duty to signal its brakemen when it is about to stop at unexpected times or places. We do hold that it may be found by a jury to be subject to that duty when, through the adoption of a rule or through a uniform course of conduct, a practice to give such a warning, on which employees may justifiably place reliance, is shown to have developed. In this case the defendant's rules *Page 64 
provide that one blast of the whistle shall be the signal to stop and apply brakes, and two blasts the signal to start and release brakes. The defendant argues that this rule was intended to apply only to the movement of trains between terminals on the main line, and not to manœuvres incidental to the making up of trains in yards and on switches. In the briefs of counsel there is much refinement of discussion whether the Y is to be classified as a part of the main line or as a yard or a switch. The case in our view does not turn upon the answer to that question. Even though the written rule considered alone would not compel the engineer to signal by whistle when starting or stopping at the Y, a uniform practice would be equivalent to a rule. (Dunne v.N.Y., N.H. H.R.R. Co., 99 App. Div. 571, 575; Inglese v.N.Y., N.H. H.R.R. Co., 133 App. Div. 198, 200.) The fact is, if the plaintiff's testimony is accepted, that when the engine was started or stopped at the Y, the same signal was given as when it started or stopped on the main line. Indeed, there were some occasions when there was just such an accidental coupling of the passenger car as caused the trouble here; and yet on all those occasions in the past, the whistle was sounded before the engine was stopped. The measure of the defendant's duty must be defined in the light of the practice thus developed. The plaintiff bending down on the running board, intent upon the work of readjusting the link, had the right to expect that before there was a sudden stop, the uniform practice would be followed and a warning given. Whether the omission of such a signal was negligence, was a question for the jury. (Texas Pacific Ry.Co. v. Behymer, 189 U.S. 468; K.C., Ft. S. M.R.R. Co. v.Murray, 55 Kan. 336.)
The judgment should be reversed and a new trial granted, with costs to abide the event.
HISCOCK, CHASE, COLLIN, CUDDEBACK and MILLER, JJ., concur; WILLARD BARTLETT, Ch. J., absent.
Judgment reversed, etc. *Page 65